# Wytheville

## Preston Byrd v. Commonwealth.

June 16, 1932.

Present, All the Justices.

The opinion states the case.

*J. Harry Rew* and *Ernest Ruediger*, for the plaintiff in error.

*John R. Saunders, Attorney-General*, and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Preston Byrd has been convicted of malicious shooting and sentenced to two years and six months confinement in the penitentiary. The evidence establishes, or tends strongly to establish, the following facts—certainly it is sufficient to sustain a verdict which depends upon them for support:

Byrd, a married man with a wife and three children, is a citizen of Accomack county and lives in the village of Makemie Park. On an unnamed Sunday morning in January, 1931, he drove from his home into the county and did not return until after supper, or about six-thirty in the evening. In the afternoon Mrs. Byrd, possibly and with some show of reason jealous, went to look for him in company with Sarah Marshall, Grace Bloxom, a daughter of John Bloxom, and with three young men in their car. Before starting out, she placed her children in Susan Hosier's home. They in a short time went over to the home of John Bloxom. All of these people were village neighbors. Byrd came back to Makemie Park before his wife's return, found no one at home, and went to look for his children. He claims to have heard them crying in the Bloxom house. At any rate he went there, inquired as to the whereabouts of his wife, and asked for them. They were delivered to him, but the Bloxoms could not tell him where his wife was. Her absence seemed to anger him, and with an oath he said: "I'll kill her just as soon as I see her." He then went back to his home and in senseless fury broke up his own furniture, armed himself with a repeating shotgun and returned to the Bloxom home. In the meantime John Bloxom, alarmed by the threat which Byrd had made, telephoned to Mrs. Byrd's father, George Richardson, telling him of the situation and of his anxiety as to what might happen. Byrd reached John Bloxom's home about the time of the return of the party which had gone to look for him. Mrs. Byrd

was not with them, for she, knowing nothing of the trouble, had gone to the Hosier home for her children. They, as we have seen, were not there, and so she set out for John Bloxom's. As she approached the house she became alarmed by the excitement occasioned by the appearance of her husband with a shotgun, ran into the garage, and later into that residence and hid. It was about this time that Byrd ordered the occupants of the automobile out. He then shot at that car, striking it in front of the driver's seat and tearing a large hole in the body. A short time thereafter John Bloxom, who had been to his uncle's home to telephone to Mrs. Byrd's father, returned to his own home, found everybody excited and that Byrd had shot up the automobile. In such circumstances anything seemed possible, and so he also armed himself with a shotgun.

Meanwhile Richardson, the father-in-law, had called up G. E. Bunting, constable, who came in answer to that summons. When he reached the Bloxom home he found everything in confusion; that Byrd had shot up the automobile, had threatened to kill his wife and was still armed with a shotgun; whereupon he summoned Bloxom to aid him in his arrest. Byrd seems then to have disappeared and they believed that he had returned to his own house. To it they went but did not find him. They did find several chairs broken into bits, a refrigerator turned over and the children locked in and crying. This constable then ordered Bloxom to take the children to his home. While Bloxom was doing this and while the constable was locking the door to the Byrd home, they heard the crash of breaking glass in the Bloxom home, a window of which Byrd had knocked out with his gun. Bloxom and the constable hastened back and saw him run from the porch. Bloxom followed him across the land of John Fletcher while the constable went up the road to intercept him. Bloxom, in an attempt to halt the accused, fired in the air. Byrd then

shot at Bloxom, striking him in the face, after which he hid his gun, made off, went to Pennsylvania, and through extradition proceedings was brought back from that State to Virginia for trial.

The issues presented are thus stated in the petition for a writ of error:

"It will appear from the above, as well as a perusal of the evidence, that there are two questions before the court for decision in this case, to-wit:

"1st. Whether or not the said Preston Byrd shot at said John Bloxom while the said Bloxom was a trespasser, or was acting as an officer of the law under Constable Bunting; in other words, was there any malice shown on the part of the said Preston Byrd for the jury to bring in a verdict as it did; and

"2nd. If the said John Bloxom was acting under proper authority, did Preston Byrd, the defendant, know or was it made known to him that the said John Bloxom was acting as an officer of the law at the time the said Preston Byrd shot the said John Bloxom."

The constable had no warrant; there was not time in which to secure one, for the situation was too pregnant with the possibilities of tragedy to admit of delay.

When an officer has a warrant directing an arrest he has the power to call others to his assistance in its execution (*Randolph* v. *Commonwealth*, 145 Va. 883, 134 S. E. 544, 47 A. L. R. 1084; 61 Am. Dec., note 154; 1 Bish. Crim. Proc. 4th ed., section 185), and if the arrest be lawful the absence of a warrant is immaterial. He has the power to arrest without warrant one charged with a felony or in the act of committing it. *Williams* v. *Commonwealth*, 142 Va. 667, 128 S. E. 572. He may also arrest without warrant where a misdemeanor is committed in his presence. *Muscoe* v. *Commonwealth*, 86 Va. 443, 10 S. E. 534. He may take like action where in his presence an imminent breach of

the peace is threatened. 5 C. J. 409; 3 Cyc. 883; Note 1 Wharton's Criminal Law (11th ed.), page 484; 1 Bish. Crim. Proc. (4th ed.), section 185. An officer without a warrant and any private citizen may make an arrest to prevent a felony. 2 R. C. L. 449; 1 Wharton's Crim. Law (11th ed.), section 382; *Spalding* v. *Preston*, 21 Vt. 9, 50 Am. Dec. 68; Note 8 L. R. A. 532.

From this it appears that an arrest without a warrant is lawful, (1) where a felony has been committed, (2) where it is being committed, (3) when it is about to be committed, (4) when a misdemeanor is committed in the presence of an officer, and (5) where a breach of the peace is imminent.

When one is called to assist an officer he, during the time that duty rests upon him, is justified in doing whatever the officer himself might lawfully do. Beale's Crim. Pl. & Pr., section 25.

If we assume that Byrd, up to the moment he shot Bloxom, was guilty of a misdemeanor only, we are to determine whether that breach was in the presence of an officer. When is one present at such a breach?

This statement of the law is made by Chief Justice Kent in *Coyles* v. *Hurtin*, 10 Johns. (N. Y.), at page 88: "The sheriff is, *quodam modo*, present, by his authority, if he be actually engaged in efforts to arrest, *dum fervet opus*, and has commanded and is continuing to command and procure assistance. When he is calling on the power of the county, or a requisite portion of it, to enable him to overcome resistance, it would be impossible that he should be actually present in every place where power might be wanting. The law is not so unreasonable as to require the officer to be an eye or ear witness of what passes, and to render all his authority null and void, except when he is so present."

"By 'peace' as used in the law in this connection, is meant the tranquility enjoyed by the citizens of a munici-

pality or community where good order reigns among its members. It is the natural right of all persons in political society, and any intentional violation of that right is 'a breach of the peace.' It is the offense of disturbing the public peace, or a violation of public order or public decorum. Actual personal violence is not an essential element in the offense." *Davis* v. *Burgess*, 54 Mich. 514, 20 N. W. 540, 542, 52 Am. Rep. 828.

■ From this it appears that there was not only a threatened breach of peace but it was actually broken in the presence of the officer, although trouble began before he arrived upon the scene. All that was done was part of one disturbance which was begun before he came but which was not finished until afterwards, and when Byrd had eluded every attempt to arrest him.

■ The attempt was lawful for another reason. This husband, in his insane fury, had run amok, and was terrorizing the neighborhood in an attempt to reach and assassinate his wife (we have his own words to describe his purpose); and to prevent the consummation of this felony any officer had the right to arrest him with or without a warrant, and any private citizen had that right whether he had been summoned to aid an officer or not.

■ It is said that neither Bunting nor Bloxom made it known to Byrd that they were undertaking to act under authority of law. He gave them no opportunity to do so, and that he acted with malice is too plain for discussion.

Objections were made to instructions although they are not argued in the petition for a writ of error. When given but one exception was taken; that was to the rejection of instruction numbered 3, tendered on behalf of the accused. It reads: "The court instructs the jury that an officer making an arrest for a misdemeanor cannot shoot the fleeing offender."

■ No reason in support of this exception was assigned.

Moreover, there was no evidence to support it. Bloxom did not shoot Byrd, and according to his testimony did not shoot at him but fired in the air in an effort to make him stop, although Byrd said that shot passed near his head. But for the attempt to arrest him, he might now be charged with murder, a felony which seemed to be on the verge of consummation. In conclusion it is to be remembered that the defendant nowhere claims to have acted in self-defense.

The judgment is a just one and must stand.

*Affirmed.*